*In re* MARIO CARTHEN, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* KAREN CARTHEN, Respondent-Appellant.)

First District (4th Division)    No. 76-905

Opinion filed November 30, 1978.

Ralph Ruebner and Gary Jay Ravitz, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

A petition for adjudication of wardship was filed in the circuit court of Cook County alleging that Mario Carthen was a neglected minor in that his environment was injurious to his welfare in violation of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 702—4(1)(b)). An adjudicatory hearing was held before Honorable Peter F. Costa who found Mario to be a neglected minor and adjudged him a ward of the court. Mario's mother, Mrs. Karen Carthen, was found to be unable to properly care for Mario. The court found that it was in the best interest of the child to appoint a guardian with the right to place. A dispositional hearing resulted in the commitment of Mario to the Department of Children and Family Services and the appointment of Richard Laymon, guardian, with the right to place. Respondent, Mrs. Karen Carthen, now appeals the ruling and we affirm.

The question for review is whether the trial court erred in allowing respondent's psychiatrist to testify as to certain facts over the objection that the relationship was privileged.

At the beginning of the hearing, the witnesses were excluded. Dr. Theodore J. Dulin, a psychiatrist and attending physician at Mount Sinai Hospital, testified that in April 1974, 22-year-old Karen Carthen became a voluntary psychiatric patient at the hospital. Her stay was for 15 days, initially, and then from May 17 to June 1, 1974.

Respondent was the mother of three children and was involved in an unhappy marriage. A product of a rather unhappy childhood, she was never close to her mother until recently, prior to her hospitalization. According to the doctor, she was a woman who had reason to develop many resentments, angers and hostilities which she kept to herself. 

He explained that her feelings arose because of her unhappy childhood and because no one gave her any real support, including her mother.

While growing up, Karen Carthen was the second oldest of nine children and assumed many responsibilities, particularly for her younger brother, Chris. Her feelings toward him were mixed. On the one hand, she felt like his mother and on the other hand had many confrontations and fights with him. Mario reminded her of Chris.

For many years she held in her feelings and many nights cried herself to sleep. When her anger began to come out, Mario was the target. This occurred because of three factors: (1) the circumstances surrounding Mario's birth, (2) the fact that Mario reminded her of Chris, and (3) because her husband was "giving her so much heat." When the prosecutor asked the doctor to explain the circumstances surrounding Mario's birth, the defense counsel objected on the basis of a patient-doctor privilege. His objection was overruled and the doctor testified that Mario's birth was the result of a rape. The doctor added that Mrs. Carthen felt that Mario was a bright boy but deliberately antagonized her.

In 1974, Dr. Dulin diagnosed Mrs. Carthen as having a passive-aggressive personality, i.e., one subject to sudden or gradual behavioral changes. He noted that during her hospital stay she seemed to develop adequate insight and made realistic plans but was unable to follow through.

Mrs. Virginia Spear, a social worker and a member of the child-abuse consultant team at Wyler's Children's Hospital, testified that she first came in contact with Mario and his mother in April 1974. A doctor at Mount Sinai Hospital had referred them to her. On March 13, 1975, Mrs. Carthen told Mrs. Spear that she had tried to kill Mario by strangling him with a television cord until he stopped breathing. Then she slapped his face so he would start breathing. Respondent told Mrs. Spear Mario was the product of a rape, she hated Mario and had told him so, and she wanted to place him. Arrangements were made for Mario's placement for the following day. When Mrs. Carthen did not bring the child in at the designated time, Mrs. Spear called her at home. Over the telephone she sounded quite upset and related that Mario had placed a bag over his head that morning and she had trouble getting it off.

When Mario was placed in the hospital on March 14, 1975, his mother was very much in agreement with the placement. Mrs. Spear was present when Mario was examined by the doctor, and she noticed there were some old scars on his legs and arms but none on his neck.

Mr. Robert Ruhloff, a social worker for the Department of Children and Family Services, testified that he first met Mrs. Carthen in March 1975. Her case was referred to his agency by Wyler's Children's Hospital when a hospital report of suspected child abuse was filed. He was assigned the follow-up which entailed arranging for Mario's placement.

Mr. Ruhloff spoke with Mrs. Carthen on March 20, 1975, in her home. For about 1 year, she had been hospitalized at Mount Sinai Hospital and thereafter became an outpatient and continued to go there for counseling.

Again, he spoke with her on June 13, 1975, at her home. A couple of weeks before their meeting, she had been released from Loretta Hospital. This time her hospitalization occurred because she had been feeling badly, had been depressed, was weak and had not been eating properly. Additionally, she had taken too many pills and had fallen.

Respondent told Mr. Ruhloff she had threatened Mario with the television cord because he had been bad. The cord accidentally looped around the child's neck when he tried to dodge her. Mario had tried to "strangle" himself with a plastic bag and she slapped him to bring him around. Respondent told Mr. Ruhloff she hated Mario and felt there were times when any parent would hate her child. She further told him that Mario was forced on her and was born as the result of a rape.

In his visits with the Carthens, Mr. Ruhloff observed that Mrs. Carthen and her children seemed pleased to see each other. The children played well together and she devoted her attention equally among them.

Respondent discussed the problems she had encountered with Mario. He was an exceedingly difficult child who was very smart but sly. It was almost impossible to find an effective means of discipline because nothing seemed to affect him. He took everything stoically and would not cry when spanked. When placed in a corner, he would stand there for hours with no feeling of remorse.

Mrs. Verna Rogers testified that she is respondent's aunt and has custody of Mario and his brother, Ronald. There were problems with Mario's behavior. He goes through the house at night while everyone else is asleep; steals constantly; has tried to start fires twice; and has a bed-wetting problem.

Mrs. Rogers testified that Mrs. Carthen told her she needed rest because Mario was getting so bad she feared hurting him. Respondent has said she both hated and loved Mario.

Mrs. Carthen testified that she is presently married and has the name of Williams. Her husband supports her "off and on." At one time she received aid to dependent children but did not at the time of the hearing because her children were not with her.

Mario was born on October 26, 1969, and was 6 years old at the time of the hearing. His father is unknown as he is the product of an unreported rape.

Respondent testified she never told anyone she hated Mario because he was the product of a rape. She has very strong feelings about it and several times has said she hated Mario and feared hurting him. Mario has been a disciplinary problem. He is very overactive and gets into a lot of

things. He has knocked all of the dishes off the table for no reason whatsoever, has set the kitchen on fire for no reason, has set the back porch on fire, and has set her bed on fire. Additionally, he fights his younger brother.

Respondent has had occasion to threaten Mario for his actions with a belt and television cord, but has never told any of the witnesses she wrapped a cord around his neck and choked him until he stopped breathing. She has told Mario she hates him.

Mrs. Carthen has encountered difficulties with Mario and has sought psychiatric help on several occasions. She attempted suicide when she was 14 years old. In May 1975, she swallowed some pills but she was not trying to commit suicide at that time, and she did not pass out.

Mrs. Carthen admitted that Mario did have scars on his body at the time she gave up custody of him, but she had not beaten him. She asked her mother and Mrs. Rogers to take her children because she could no longer cope with them. Her permission was given for the children to go to her family, not the Department of Children and Family Services.

Dr. Janice Mendelson testified that she is a general pediatrician and is the director of the children's emergency room and a child abuse consultant at Wyler's Children's Hospital. When she examined Mario on March 16, 1975, he was in good health but had multiple, semicircular, old scars on his arms, legs and the upper part of his back. The marks were those characteristically left by beatings with an extension or electrical cord. Quite possibly, the marks could have been caused by a belt that had been folded, but nothing else. Pursuant to her examination of Mario, Dr. Mendelson filed a report of suspected child abuse with the Department of Children and Family Services.

■■ Respondent contends that her patient-psychiatrist privilege was violated when Dr. Dulin, her psychiatrist, was allowed to testify as to the circumstances surrounding Mario's birth. It is true, as respondent argues, that she had a statutory right to expect that her communication with her psychiatrist would not be revealed in court.

> "In civil and criminal cases, in proceedings preliminary thereto, and in legislative and administrative proceedings, a patient or his authorized representative and a psychiatrist or his authorized representative have the privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental condition between patient and psychiatrist * * *." Ill. Rev. Stat. 1975, ch. 51, par. 5.2.

Respondent urges that the finding of neglect be reversed on the ground that it was reversible error to admit into evidence the confidential communications she had with her doctor. She bases her position on the holding in the case of *In re Westland* (1976), 48 Ill. App. 3d 172, 362

N.E.2d 1153. In *Westland*, at page 176, the appellate court of Illinois reversed a trial court's finding that five minors were neglected and dependent where their mother's psychiatrist was allowed to testify as to her dependency on her mother and the cause of her mental breakdowns. · The court found that it might have been proper for the doctor to testify as to any of his observations of his patient but the information he testified about could only have been obtained from "communications" with her.

It should be noted that in *Westland* all of the psychiatrist's testimony was given over the mother's objection, whereas here respondent objected only to allowing the psychiatrist to testify as to the circumstances of her child's birth. Two other witnesses, Mrs. Spear and Mr. Ruhloff, testified that Mrs. Carthen told them Mario was the product of a rape without objection.

Where evidence similar to that objected to is admitted without objection, respondent cannot assign error on the admission of the evidence to which she objected. *People v. Allen* (1959), 17 Ill. 2d 55, 61, 160 N.E.2d 818, 823.

The State asserts that even if the admission of the psychiatrist's testimony was error it was not reversible error, citing *In re Wellington* (1975), 34 Ill. App. 3d 515, 340 N.E.2d 31. In the case of *Wellington*, the court concluded, as we have here, that it was error for the trial court to overrule the objection to the psychologist's testimony. What remains is the question of whether this was reversible error.

■■ Generally, error is not reversible without a showing of prejudice. Error that permits an unqualified witness to testify before a jury is not prejudicial if there is sufficient and competent evidence to the same effect. (*Wellington*, at 519.) Again, according to Mrs. Spear and Mr. Ruhloff, respondent told them that Mario was the product of a rape. In addition, the record is replete with other testimony, some of which is set out above, regarding Mrs. Carthen's objectionable attitude toward and treatment of her son, Mario.

■■ We hold that whereas it was error to allow the psychiatrist to testify as to what respondent told him in their confidential relationship, it was not reversible error, since sufficient and competent evidence was introduced to the same effect.

For the foregoing reasons, we affirm the ruling of the circuit court of Cook County.

Affirmed.

ROMITI and LINN, JJ., concur.